1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lawrance A. Bohm (SBN: 208716)
Andrew C. Kim (SBN: 309160)
**BOHM LAW GROUP, INC.**
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834
Telephone:  916.927.5574
Facsimile:  916.927.2046

Attorneys for Plaintiff
SHUANG ZHANG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

SHUANG ZHANG,

      Plaintiff,

      v.

WILLIAM PARFET, an individual; DOES 1
through 10,

      Defendant.

Case No:

**PLAINTIFF'S VERIFIED COMPLAINT FOR DAMAGES:**

1. **SEXUAL HARASSMENT (Cal. Gov't Code § 12940(J))**

2. **SEX DISCRIMINATION (Cal. Gov't Code § 12940(A))**

3. **RETALIATION (Cal. Gov't Code § 12940(H))**

4. **FAILURE TO PREVENT DISCRIMINATION, HARASSMENT, AND RETALIATION (Cal. Gov't Code § 12940(K))**

5. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

**DEMAND FOR JURY TRIAL**

Plaintiff SHUANG ZHANG respectfully submits the instant Verified Complaint for Damages and Demand for Jury Trial and alleges as follows:

///

///

///

///

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

1

**OVERVIEW OF THE CASE**

"[T]he firetruck was coming and the siren was on." This was how Defendant William Parfet, a pharmaceutical tycoon, joked about his Viagra-induced erection, as Plaintiff Shuang Zhang lied motionless after attempting to escape reality through sleeping pills and alcohol. Defendant Parfet took advantage of Plaintiff Zhang's history of sexual abuse and depression and used her to satisfy his insatiable sexual needs for several years, which resulted in two children with Defendant Parfet. Defendant Parfet demanded sex under the threat that Plaintiff Zhang would suffer adverse consequences, including termination, if she did not give into his demands. Further, Defendant Parfet promised to help support their two (2) children in exchange for continued sexual relations. However, Defendant Parfet refused to publicly acknowledge their children and he also refused to provide any financial or emotional support. For example, when Plaintiff Zhang was hospitalized for depression and suicidal ideation, Defendant Parfet ignored her pleas for help by telling her she is a "strong woman." Once Plaintiff Zhang summoned the strength to refuse any further sexual advances by Defendant Parfet, Plaintiff Zhang was terminated on September 5, 2014.

**PARTIES**

1.      Plaintiff SHUANG ZHANG (hereinafter "ZHANG" or "Plaintiff") was at all times relevant to this action, a recruit, employee, or wrongfully terminated employee of Defendant WILLIAM PARFET (hereinafter "PARFET" or "Defendant").

2.      PLAINTIFF became a U.S. Citizen in March 2010, and, at all times relevant to this action, she maintained her legal status in the United States. Prior to obtaining citizenship, PLAINTIFF had a Student Visa, an H1B Visa, and permanent residency status. She currently resides in the County of San Mateo, California.

3.      Defendant PARFET was the Founder, Chairman, and Chief Executive Officer of MPI Research, Inc. (hereinafter "MPI") at all times relevant to this action, and was an employer within the meaning of California's Fair Employment and Housing Act, codified as California Government Code section 12926, subdivision (d). PARFET resides in Michigan, but regularly does business in California. PARFET agreed that he was PLAINTIFF's legal employer for

2

purposes of employment claims, and PARFET further agreed that he will bear full financial responsibility for any such claim if liability is found and damages are awarded. (A true and correct copy of the Tolling and Financial Responsibility Agreement is attached hereto as **Exhibit A**).

## JURISDICTION AND VENUE

4.      Venue and jurisdiction are proper because a substantial part of the events giving rise to this action took place in Santa Clara County; because DEFENDANT was doing business in Santa Clara County; because PLAINTIFF's employment was entered into in Santa Clara County; because PLAINTIFF worked for DEFENDANT in Santa Clara County; and because the majority of witnesses reside in Santa Clara County.

5.      The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

6.      On March 17, 2015, PLAINTIFF filed a complaint with the Department of Fair Employment and Housing, case number 508769-150764, and received a Right-to-Sue letter. (A true and correct copy attached hereto as **Exhibit B**). Therefore, PLAINTIFF has exhausted her administrative remedies.

7.      The running of any statute of limitations period, statute of repose period, laches period, or any other similar time period which could, if commenced or allowed to keep running, operate to bar the assertion of any claims between PARFET and PLAINTIFF was suspended and tolled as of March 10, 2016. (See Exhibit A). Neither party attempted to terminate the tolling provisions.

## STATEMENT OF FACTS

8.      At all times relevant to this action, PARFET was the Founder, Chief Executive Officer and Chairman of MPI, the largest single-site preclinical/early clinical contract research organization in the world. MPI has approximately 1,300 employees and annual revenues of approximately 200 million U.S. dollars. PARFET was also an heir to the Upjohn Company, which was one of the largest pharmaceutical companies in the United States, and he was a board member of three Fortune 500 Companies – Monsanto Company, Stryker Corporation, and Taubman Center, Inc.

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**                    Lawrance A. Bohm, Esq.
*Zhang v. Parfet*                                                                            Andrew C. Kim, Esq.

9.      PLAINTIFF first came to the United States as a student in 1999, when she enrolled in the MBA program at the University of West Florida. After receiving her MBA in 2002, she moved to the Bay Area in Northern California to live with her future husband, and they married in 2004. PLAINTIFF has mostly worked in the Biotech and Pharmaceutical industry throughout her career and has consulted for numerous companies in the United States and China.

10.     In or around January 2005, PARFET first met PLAINTIFF in China when PLAINTIFF organized a business trip to meet potential business partners on behalf of Bridge Pharmaceuticals. PARFET later confessed to PLAINTIFF that he was interested in her since the moment he saw PLAINTIFF in her traditional Chinese dress walking down the stairs at the White Swan Hotel in Guangzhou, China.

11.     In or around June 2005, PLAINTIFF left Bridge Pharmaceuticals because of the company's internal turmoil.

12.     In or around October 2005, PARFET visited China. As PARFET's independent consultant, PLAINTIFF spent months arranging various travel plans, including jets, yachts, special tours, and business meetings. After the trip, PARFET told PLAINTIFF that he considered her a friend and would act as her mentor.

13.     In or around 2005, PLAINTIFF was intimidated by PARFET when they first met because of his authority, reputation and power.

14.     Approximately between the years 2005 and 2007, PLAINTIFF worked as a consultant for PARFET on MPI's strategy to set up a joint venture in China. PLAINTIFF's job responsibilities as a consultant included, but were not limited to, the following: work with MPI to establish a MPI China subsidiary plan; develop China strategy and communicate with stakeholders in China for the best implementation of the strategy; conduct due diligence of the preclinical resources in China; gather Chinese market intelligence associated with preclinical studies; promote MPI's image and market its services in China; organize special events and visits between China and the United States; facilitate communication and follow up on discussions and contract negotiations with stakeholders in China; market contract preclinical services to international life sciences companies and develop new business opportunities on behalf of MPI.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Zhang v. Parfet*

Lawrance A. Bohm, Esq.
Andrew C. Kim, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

15.     In or around April 2006, PARFET asked PLAINTIFF to come to his hotel room to talk about MPI's China strategy during the Biotechnology Industry Organization Conference in Chicago.  When PARFET noticed that PLAINTIFF was visibly nervous, he told her to relax. PARFET told PLAINTIFF that he seldom invited people to his hotel room but he wanted to share MPI's China strategy with her. PLAINTIFF was relieved to get through the meeting without any issues.

16.     In or around late April 2006, PARFET hired STEVE PORTER (hereinafter "PORTER") to help with MPI's China strategy. Because PORTER had never been to China, PARFET asked PLAINTIFF to teach PORTER the Chinese preclinical industry. PLAINTIFF and PORTER went to China to meet with potential partners for MPI. During this trip, Plaintiff found out that PORTER was using MPI resources to work on his other consulting clients. After she reported this issue to PARFET, PLAINTIFF noticed that PORTER's attitude towards PLAINTIFF changed. For example, PORTER would withhold information from PLAINTIFF, which made it hard for her to do her job and PORTER also tried, and eventually hired, another consultant to replace PLAINTIFF.

17.     In or around July 2006, PLAINTIFF started seeing her psychiatrist, DR. RICHARD CORELLI (hereinafter "DR. CORELLI"). This was the first time PLAINTIFF was able to see a therapist about her history of sexual abuse, military training, and other traumas.

18.     In or around February 2007, PLAINTIFF disclosed some of her traumatic experiences and how they affected her in an email to PARFET. PLAINTIFF believed PARFET was her mentor and trusted him to look out for her best interests.

19.     On or about May 13, 2007, PLAINTIFF received an offer to join Zhongke Laboratory Animal Co., Ltd. (hereinafter "ZHONGKE") in China. The main responsibility of this position was to upgrade ZHONGKE's preclinical lab through partnering with U.S. pharmaceutical companies.

20.     In or around May 2007, PARFET instructed PLAINTIFF to take his daughter and his friend's daughter to China. PARFET compensated PLAINTIFF for organizing the trip for the girls.

21.     In or around August 2007, PLAINTIFF started working for ZHONGKE as the General Manager of its preclinical lab. When PARFET found out, he asked PLAINTIFF to continue working for him as a consultant since MPI needed her help in China. PLAINTIFF agreed to help.

22.     In or around January 2008, PARFET met with PLAINTIFF at J.P. Morgan Healthcare Conference. PLAINTIFF previously heard that MPI's joint venture in China was running into problems, so she asked PARFET if he would consider partnering with ZHONGKE. PARFET expressed interest and said he would visit ZHONGKE in China.

23.     On or about February 26, 2008, PARFET and his MPI team went to China to visit ZHONGKE for their potential collaboration. PARFET discussed business with PLAINTIFF over dinner, and then PARFET invited PLAINTIFF to dance with him. Eventually, PARFET invited PLAINTIFF to his hotel room in order to continue their discussion. However, once PARFET and PLAINTIFF entered his room, PARFET unexpectedly started kissing PLAINTIFF. PARFET took off PLAINTIFF's jacket, unzipped her dress, and stuck his tongue in her mouth. PLAINTIFF did not reciprocate because she was overcome by shock, fear, and helplessness. PLAINTIFF was repulsed because he was bald, overweight with a protruding belly, and 27 years her senior. PARFET failed to get an erection and forced PLAINTIFF to perform oral sex on him.

24.     On or about February 27, 2008, PARFET ordered PLAINTIFF to be discreet, and to act as if nothing happened the previous night because he is a high-profile figure.

25.     On or about February 27, 2008, after visiting ZHONGKE, PARFET asked PLAINTIFF to go to Shanghai with him so that they could continue discussing MPI and ZHONGKE's potential collaboration. PARFET and PLAINTIFF checked into different hotel rooms in Shanghai, but PARFET went to PLAINTIFF's room and demanded sex. Once again, PARFET failed to get an erection and spent all night struggling to penetrate PLAINTIFF.

26.     On or about February 28, 2008, PARFET told PLAINTIFF that it would be unlikely for MPI to collaborate with ZHONGKE.

///

///

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

27.     In or around June 2008, PARFET asked PLAINTIFF to arrange business meetings in China. However, PARFET told her that the main purpose of the trip was to see her. PARFET requested that they get separate rooms to be discreet, but he spent every night in PLAINTIFF's room. PARFET demanded sex multiple times every night. Because PARFET had trouble getting an erection, he ordered PLAINTIFF to purchase Viagra for him.

28.     PARFET became insatiable after he took Viagra. He wanted sex during the day and also at night. PLAINTIFF could not sleep because PARFET would wake her up and demand sex. PLAINTIFF attempted to resist PARFET's demands and also disclosed the fact that she was extremely depressed. PARFET disregarded PLAINTIFF's pleas. PARFET told PLAINTIFF that he did not believe in depression, and that it was a "weakness in character." Further, PARFET told PLAINTIFF that she is a strong woman and that she can survive without antidepressants.

29.     When PLAINTIFF was too depressed to even get out of bed, PARFET still demanded sex. One night, PLAINTIFF combined sleeping pills and alcoholic beverages to make herself unavailable for sex with PARFET. The next morning, PARFET complained about PLAINTIFF lying next to him motionless after he took Viagra. PARFET joked that "the firetruck was coming and the siren was on," indicating PARFET wanted to have sex with his Viagra-induced erection. At one point during the trip, PARFET and PLAINTIFF watched a movie called "The Black Book," in which a Jewish woman was forced to sleep with Nazi officers to survive.

30.     In or around June 2008, shortly after PARFET's visit, PLAINTIFF's depression was so debilitating that she had to fly back to the United States to seek help from a psychiatrist, who prescribed antidepressants for PLAINTIFF.

31.     In or around early July 2008, PLAINTIFF began to feel better after she resumed taking antidepressants.

32.     In or around early July 2008, PARFET offered PLAINTIFF a job at MPI's joint venture, and also asked her to join him, his family, and his friends on a yacht trip to Canada in order to discuss the job he offered to PLAINTIFF. PARFET's wife and daughter left soon after PLAINTIFF arrived. PARFET took PLAINTIFF out on a dinghy, where he demanded sex, and PLAINTIFF could not help but surrender to PARFET's demands.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

7

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

33.    On or about August 27, 2008, PARFET instructed PLAINTIFF to fly to MPI's headquarters in Michigan to discuss MPI China strategy. He then asked her to accompany him to a car show in Auburn, Indiana. PARFET went to PLAINTIFF's hotel room in Auburn and demanded sex. Given the fact that PARFET was offering her a job, in addition to PLAINTIFF's severe depression, she felt it was futile to resist PARFET's demands for sex.

34.    On or about September 2, 2008, PLAINTIFF started working for MPI full-time and was titled Vice President of Operational Liaison for MPI's joint venture in China. PLAINTIFF's salary was to be $85,000 per year. PARFET told PLAINTIFF that he sensed there were problems with the MPI management team, which was led by the then Chief Operating Officer and President BILL HARRISON (hereinafter "HARRISON"). PARFET stated that he trusted PLAINTIFF and hired PLAINTIFF to be his representative. Although PARFET instructed PLAINTIFF to report to HARRISON, PARFET would call PLAINTIFF and ask for updates on MPI's joint venture in China. This arrangement created a conflict between PLAINTIFF and HARRISON, who did not want to outsource jobs to China.

35.    In or around September 2008, PARFET went to PLAINTIFF's hotel room during her orientation at MPI and demanded sex.

36.    In or around September 2008, PARFET took PLAINTIFF to the Gilmore Car Museum, where he demanded sex but failed to get an erection. PARFET forced PLAINTIFF to perform oral sex on him.

37.    In or around early October 2008, PLAINTIFF found out she was pregnant.

38.    On or about October 6, 2008, PLAINTIFF told PARFET that she was pregnant with his child. PARFET told PLAINTIFF that they should discuss her pregnancy when they meet in China.

39.    On or about October 13, 2008, PARFET and PLAINTIFF stayed in Chengdu, China. PARFET told PLAINTIFF that it was great that they were going to have a child together, and also that he wanted to marry her.  PLAINTIFF instantly refused to marry PARFET. At night, PARFET went to PLAINTIFF's room and demanded sex. PLAINTIFF was worried about having a miscarriage. PARFET ignored PLAINTIFF's concerns and had rough sex with her.

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**                    Lawrance A. Bohm, Esq.
*Zhang v. Parfet*                                                                           Andrew C. Kim, Esq.

40.    On or about October 14, 2008, PARFET changed his attitude about PLAINTIFF's pregnancy and demanded that she get an abortion. PARFET threatened PLAINTIFF that she would be left on her own if her husband found out the truth about the child. PARFET also accused PLAINTIFF of being a gold-digger. PLAINTIFF wanted to keep the baby because she thought it was a miracle that she was pregnant after years of believing she was infertile. PLAINTIFF decided to keep the baby after she heard the baby's heart beat for the first time at the first ultrasound check. PARFET was angry with PLAINTIFF's decision and continued to pressure her into getting an abortion.

41.    In or around November 2008, PARFET called PLAINTIFF telling her that he would support PLAINTIFF's decision to keep the child. PARFET also requested to see his child in the future.

42.    In or around March 2009, PLAINTIFF returned to the United States during her third trimester. PLAINTIFF requested maternity leave from MPI prior to her return, but was denied. Instead, MPI changed PLAINTIFF's full-time position into a part-time job.

43.    On May 5, 2009, PLAINTIFF gave birth to her first son.

44.    In or around late August 2009, MPI terminated PLAINTIFF without prior notice. Consequently, PLAINTIFF lost her medical insurance coverage while taking care of her infant son.

45.    On or about September 2, 2009, PLAINTIFF and MPI executed a severance agreement and MPI provided $12,310.40 for PLAINTIFF's severance pay.

46.    On or about September 3, 2009, PARFET's Assistant emailed PLAINTIFF stating, "[PARFET] apologizes for [HARRISON]'s unprofessional moves. While he knows they were not intentional towards [PLAINTIFF], bad decisions happened and he is disappointed by them."

47.    In or around October 2009, PARFET asked MPI to contact PLAINTIFF to have her negotiate the dissolution of MPI's joint venture in China. MPI paid PLAINTIFF on an hourly basis.

///

///

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**                    Lawrance A. Bohm, Esq.
*Zhang v. Parfet*                                                                            Andrew C. Kim, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

48. In or around March 2009, Chief Executive Officer of ZuvaChem asked PLAINTIFF to help him connect with PARFET. Subsequently, PLAINTIFF continued to work as a business consultant for ZuvaChem in which her main responsibility at ZuvaChem was to recruit new investors.

49. In or around June 2010, PLAINTIFF had a paternity test done for her son, and the test results excluded her husband as the biological father.

50. In or around April 2011, PARFET expressed interest in ZuvaChem and agreed to serve as an advisor.

51. On or about April 26, 2011, Chief Executive Officer of ZuvaChem and PLAINTIFF visited PARFET to discuss ZuvaChem. When PARFET and PLAINTIFF were alone, PARFET showed PLAINTIFF pictures of their son. PARFET then indicated that he knew he was the biological father of the child.

52. On or about April 27, 2011, PARFET told PLAINTIFF he wanted to continue discussing ZuvaChem and told her to meet him in Detroit, where he was going to have a meeting later that day. PARFET went to PLAINTIFF's hotel room and demanded sex. He failed to get an erection and forced PLAINTIFF to perform oral sex on him.

53. On or about June 21, 2011, during his visit out to the Bay Area, PARFET told PLAINTIFF to make a reservation at a hotel near Sonoma County Airport. After they checked in, PARFET demanded sex from PLAINTIFF.

54. In or around late July 2011, PLAINTIFF told PARFET that the child was his son.

55. In or around early August 2011, PARFET flew to China to meet with a ZuvaChem board member and other potential investors. During this trip, PARFET met with PLAINTIFF and their son. Upon seeing the child, PARFET admitted that he did not need a paternity test to confirm that the child was his son. At the hotel in Qingdao, PARFET demanded sex in his room.

56. The day before he departed, PARFET promised PLAINTIFF that he would take care of her and their child. PLAINTIFF shared her history of sexual abuse, military training, and clinical depression. After hearing PLAINTIFF's history, PARFET told her that he empathized with her pain because of his own family issues. PARFET also suggested that they should "just be

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

friends." Further, he offered her a job at MPI but PLAINTIFF declined because she suspected PARFET would continue to demand sex from her. PARFET also instructed PLAINTIFF to tell others, including her husband, that she conceived the child through a sperm bank.

57.     On or about September 20, 2011, PARFET indicated to PLAINTIFF that he could be an investor for ZuvaChem and that he wanted to meet with the ZuvaChem team in Baltimore. PARFET later called PLAINTIFF to tell her that he wanted her to accompany him to his hunting lodge after the team meeting because he wanted to talk more about ZuvaChem.

58.     On or about September 23, 2011, PARFET met with the ZuvaChem team in Baltimore and later became a board member.

59.     On or about September 24, 2011, PARFET and PLAINTIFF went to PARFET's hunting lodge. PARFET took PLAINTIFF to his room and demanded sex; however, PARFET failed to get an erection. The next morning, PARFET snuck into PLAINTIFF's room and managed to have penetration with her. Afterwards, PARFET stated that it must be "fate" if PLAINTIFF were to get pregnant again.

60.     On or about October 21, 2011, PLAINTIFF learned that she was pregnant again.

61.     In or around November 2011, PLAINTIFF told PARFET that she was pregnant again and also that it was highly likely his child.

62.     Approximately between October 2011 and June 2012, PLAINTIFF suffered from stress and complications caused by her pregnancy. PLAINTIFF developed Hyperemesis Gravidarum, a condition characterized by severe nausea, vomiting and electrolyte disturbance. PLAINTIFF was prescribed Zofran, which was commonly used to prevent nausea and vomiting for chemotherapy patients. She also received fluid and nutrition through an intravenous line at the Palo Alto Medical Foundation.

63.     In or around late 2011, PLAINTIFF sought help from a licensed therapist in order to address her depression and PARFET's unwanted sexual advances.

64.     In or around spring 2012, PARFET stopped by PLAINTIFF's house in the Bay Area. This was the second and also the last time PARFET saw their first son.

///

65.     On or about April 13, 2012, PARFET notified ZuvaChem that he was not going to invest in ZuvaChem.

66.     On June 7, 2012, PLAINTIFF gave birth to her second son.

67.     In or around September 2012, PARFET asked PLAINTIFF to find Chinese investors for one of his pharmaceutical companies, Metabolic Solutions.

68.     In or around October 2012, PLAINTIFF signed up for a free neuroscience study on Post-Traumatic Stress Disorder (hereinafter "PTSD") by Stanford University. This was the first time PLAINTIFF received targeted treatment for PTSD.

69.     On or about November 12, 2012, PLAINTIFF helped PARFET organize a business networking event at PARFET's hunting lodge. During her stay, PLAINTIFF asked PARFET to provide support for their children. PLAINTIFF also shared with PARFET that she is suffering from PTSD, along with her history of sexual abuse and clinical depression. When PLAINTIFF asked PARFET to help her pay for her psychiatric treatments, PARFET told PLAINTIFF that she was a "strong woman" and refused to help.

70.     On or about January 25, 2013, PLAINTIFF told her husband that he was not the father of the two children and that the children were conceived through a sperm bank. When PARFET heard what PLAINTIFF told her husband, he insisted that PLAINTIFF continue using to the sperm bank story.

71.     In or around February 2013, PLAINTIFF went to the emergency room at the El Camino Hospital in Mountain View due to the worsening symptoms of PLAINTIFF's depression and PTSD.

72.     On or about March 4, 2013, PLAINTIFF was hospitalized at the El Camino Hospital's psychiatric ward.

73.     On or about March 8, 2013, the El Camino Hospital released PLAINTIFF to the partial hospitalization program for acute mental conditions. Unfortunately, PLAINTIFF's mental condition did not improve because she was too embarrassed to talk about her unwanted relationship with PARFET and their two children during the group sessions. PLAINTIFF begged for PARFET's help when he came to visit during her partial hospitalization. PARFET told her

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

1    that she could survive because she is a "strong woman."

2         74.    On or about March 18, 2013, PLAINTIFF returned to her former psychiatrist, but

3    her depression continued.

4         75.    In or around late March 2013, PARFET called PLAINTIFF to ask her to

5    accompany him to China because Stryker Corporation acquired Trauson, an orthopedic company

6    in China.

7         76.    On or about March 21, 2013, PLAINTIFF was hospitalized at the Good Samaritan

8    Hospital in Saratoga due to the worsening symptoms of depression. PLAINTIFF was forced to

9    lie and told the Hospital that her children were conceived through a sperm bank. Consequently,

10   PLAINTIFF was unable to seek help for her underlying problems with PARFET. The hospital's

11   psychiatrist diagnosed her with bipolar disorder.

12        77.    On or about April 4, 2013, PLAINTIFF was released from Good Samaritan

13   Hospital.

14        78.    In or around May 2013, PLAINTIFF was suffering from depression and suicidal

15   thoughts. PLAINTIFF attempted to end her life on railway tracks and she also tried to jump off

16   of a building. However, PLAINTIFF's sister followed her everywhere and prevented PLAINTIFF

17   from committing suicide.

18        79.    On or about May 8, 2013, PLAINTIFF returned to China at her parents' insistence.

19   PLAINTIFF's parents believed that a change of environment would help her depression.

20        80.    On or about May 27, 2013, the Chairman of Cenova Ventures contacted

21   PLAINTIFF to ask her if she could connect him with Stryker Corporation, where PARFET served

22   as the chairman.

23        81.    In or around July 2013, PLAINTIFF started to recover from her depression after

24   receiving psychiatric treatment.

25        82.    In or around July 2013, PARFET asked PLAINTIFF to meet him in China to

26   discuss how he could help PLAINTIFF and her career.

27        83.    In or around August 2013, PLAINTIFF began visiting a psychiatrist in the Bay

28   Area.

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial          Lawrance A. Bohm, Esq.
*Zhang v. Parfet*                                                              Andrew C. Kim, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

84.     In or around September 2013, PARFET suggested that PLAINTIFF take a job with MPI. Executive Vice President of Global Sales and Marketing, ED AMAT (hereinafter "AMAT"), contacted PLAINTIFF regarding PARFET's job offer with MPI.

85.     On or about October 11, 2013, PARFET and PLAINTIFF met in China for business meetings. During the five-hour train ride from Beijing to Shanghai, PARFET and PLAINTIFF discussed their personal issues. PLAINTIFF told PARFET about her suicidal attempts, depression, PTSD, history of sexual abuse, and the stress of keeping secrets about their relationship and children. PARFET claimed to empathize with PLAINTIFF's suffering, and assured PLAINTIFF that she did not have to worry about anything anymore. Further, PARFET stated that many women in his family suffered from depression and disclosed private information about a family member. PARFET's behavior, however, did not change. When they arrived in Shanghai, PARFET went to PLAINTIFF's room and demanded sex again.

86.     On or about October 12, 2013, after the meeting with Cenova Ventures, PARFET told PLAINTIFF that it would be unlikely that Stryker Corporation would invest in Cenova Ventures. PARFET again spent the night in PLAINTIFF's room, demanding sex throughout the night.

87.     On or about October 13, 2013, PARFET spent most of the day in the hotel room with PLAINTIFF, demanding sex throughout the day.

88.     On or about October 14, 2013, PLAINTIFF asked PARFET to provide support for their children and her medical bills. PARFET offered $35,000 for each child. PARFET also told her that she should use her husband's insurance for psychiatric treatment despite the fact that they previously discussed how difficult it was for PLAINTIFF to find competent psychiatric help within her insurance network. When PLAINTIFF started crying out of frustration, PARFET kept asking her, "Why are you upset?" PARFET left PLAINTIFF alone at the bar. Later that evening, PARFET followed PLAINTIFF to her room after dinner and told her that she cannot upset him if she wanted help from him. PARFET demanded sex multiple times that night, but failed to get an erection. PARFET then blamed PLAINTIFF for his impotency.

///

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

89.     In or around October 2013, MPI's Executive Vice President AMAT contacted PLAINTIFF regarding PARFET's job offer, and told her that it was for a sales position. AMAT set unrealistic goals for PLAINTIFF, who did not receive adequate training. PLAINTIFF called PARFET and told him that she was not qualified for the sales position. In response, PARFET told PLAINTIFF not to worry, and that the position was like a "goodwill ambassador." PARFET also told PLAINTIFF that the job would give him an excuse to see her in the Bay Area.

90.     In or around December 2013, PLAINTIFF signed the offer letter from MPI and started working on sales for MPI from the Bay Area. The position had an annual salary of $80,000.

91.     In or around early February 2014, PLAINTIFF asked PARFET for help because she started experiencing symptoms of depression due to the pressure and stress from her new sales position. She felt inadequate. PLAINTIFF requested a transfer to a position that matched her skills and experience, such as finding Chinese investors and partners. PARFET told her that he needed to be discreet and therefore, she needed to work it out with AMAT.

92.     On or around February 10, 2014, PARFET visited the Bay Area and requested PLAINTIFF to join him at his hotel in San Jose. PARFET called Plaintiff "mommy" and asked about their "two wonderful kids" before demanding sex. PLAINTIFF complied because PARFET told her that her job depended on her being "nice" to him. After PLAINTIFF complied with PARFET's sex demands, AMAT's scrutiny over PLAINTIFF's work noticeably decreased.

93.     On or about March 23, 2014, PARFET asked PLAINTIFF to attend a pharmaceutical conference in Phoenix, Arizona. At the reception, PARFET told PLAINTIFF that AMAT did not believe she was worthy of her salary. Later, PARFET asked PLAINTIFF to get a room at the same hotel where he was staying with his wife during the conference. However, there were no rooms available. PARFET then drove PLAINTIFF to a different hotel, where he demanded sex. PARFET called PLAINTIFF "mommy" and asked about their "two wonderful kids."

94.     In or around early June 2014, PLAINTIFF filed for child support from PARFET.

///

///

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial     Lawrance A. Bohm, Esq.
*Zhang v. Parfet*                                                        Andrew C. Kim, Esq.

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

95.     On or about June 5, 2014, PARFET came to San Francisco for a board meeting and he asked PLAINTIFF to get a hotel room. Instead of complying with his request, PLAINTIFF met with PARFET for dinner only to serve him with the family lawsuit for child support. PARFET attempted to get PLAINTIFF drunk by pressuring her to drink.

96.     On or about July 9, 2014, PLAINTIFF flew to Denver, Colorado to meet with PARFET at his request. PARFET said he wanted to resolve the issues without getting lawyers involved. PARFET attempted to get PLAINTIFF drunk and made sexual advances at her by trying to get into her hotel room. However, PLAINTIFF refused. The next morning, PARFET and PLAINTIFF discussed child support. PARFET offered PLAINTIFF another job with MPI, with better pay and better benefits. PARFET also promised a position that would match her skills and experience. However, PLAINTIFF declined.

97.     In or around August 2014, multiple times PARFET tried to talk PLAINTIFF into accepting another offer at MPI but PLAINTIFF declined each time. PLAINTIFF noticed that AMAT started to check on her sales more aggressively.

98.     On or about September 5, 2014, AMAT terminated PLAINTIFF from her sales position.

99.     On or about October 14, 2014,  PARFET indicated that he wanted a paternity test for the two (2) children.

100.    On or about February 13, 2015, the paternity test confirmed PARFET as the biological father of both children.

101.    On or about February 24, 2015, PARFET refused to pay child support even though a DNA test confirmed that he was the biological father of both children.

## FIRST CAUSE OF ACTION

### (Sexual Harassment; Cal. Gov't Code § 12940(j))

102.    The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

///

///

103.    At all times relevant to this matter, the Fair Employment and Housing Act and California Government Code section 12940 were in full force and effect and binding on Defendants. California Government Code section 12940, subdivision (j) reads, "It is an unlawful employment practice…[f]or an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation, to harass an employee, an applicant, or a person providing services pursuant to a contract."

104.    Defendant was Plaintiff's employer within the meaning of California Government Code section 12926, subdivision (d) and, as such, barred from illegal harassment as set forth in California Government Code section 12940, subdivision (j).

105.    Plaintiff was subjected to sexual harassment including, but not limited to, unwanted sexual intercourse, and unwanted sexual advances. These deplorable acts were persistent throughout Plaintiff's employment with Defendant. These harassing acts were conducted by Defendant, who created an environment that, among other things, tolerated and encouraged harassment and discrimination against Plaintiff that impacted the terms and conditions of Plaintiff's employment. The conduct on the part of Defendant represents a violation of California Government Code section 12940, subdivision (j) and Title 2 of the California Code of Regulations sections 11019 and 11020.

106.    A reasonable person in Plaintiff's circumstances would have considered Defendant's conduct and the work environment to be hostile and abusive. The harassment was severe and/or pervasive.

107.    Plaintiff considered Defendant's conduct and work environment to be hostile or abusive.

108.    Defendant knew or should have known of the harassing conduct and failed to take immediate and appropriate corrective action.

///

Bohm Law Group, Inc.
4600 Northgate Boulevard, Suite 210
Sacramento, California 95834

17

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

109.   The conduct of Defendant was a substantial factor in causing Plaintiff's harm.

110.   As an actual and proximate result of the aforementioned violations, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court. Plaintiff also seeks "affirmative relief" or "prospective relief" as defined by California Government Code section 12926, subdivision (a), including back pay, reimbursement of out of pocket expenses and any such other relief that this Court deems proper.

111.   As an actual and proximate result of Defendant's willful and intentional discrimination, Plaintiff has lost wages, benefits, and other out of pocket expenses.

112.   As an actual and proximate result of the aforementioned acts of Defendant, Plaintiff became mentally upset, stressed, aggravated, depressed, and suicidal. Plaintiff has experienced stress, migraines, anxiety, humiliation, embarrassment, sleeplessness, fear and emotional distress. Plaintiff claims general damages for mental distress in an amount according to proof at time of trial.

113.   The above described actions were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights. Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendant's future conduct.

## SECOND CAUSE OF ACTION

### (Sex Discrimination; Cal. Gov't Code § 12940(a))

114.   The allegations set forth in paragraphs above are hereby re-alleged and incorporated by reference.

115.   At all times relevant to this matter, the Fair Employment and Housing Act and California Government Code section 12940 were in full force and effect and binding on Defendants.

116.   As set forth above, Defendant unlawfully discriminated against Plaintiff because of her sex and/or gender, by subjecting her to constant demeaning treatment, unwelcome and inappropriate sexual advances, and illicit remarks, in addition to subjecting Plaintiff to a harassment-drenched environment. Defendant condoned an environment that, among other

things, tolerated and encouraged discrimination based on sex and/or gender and materially and negatively impacted the terms and conditions of Plaintiff's employment. Defendant's conduct complained of herein violated California Government Codes section 12940, subdivision (a) and Title 2 of the California Code of Regulations sections 11019 and 11020.

117.   Plaintiff's sex and/or gender was a substantial motivating reason for the termination, denial of the opportunity to apply to a different position, denial of leave, denial of a reasonable accommodation, and cancelled benefits.

118.   Plaintiff's termination, denial of the opportunity to apply to a different position, denial of leave, denial of a reasonable accommodation, and cancelled benefits were a substantial factor in causing her harm.

119.   As an actual and proximate result of the aforementioned violations, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court. Plaintiff also seeks "affirmative relief" or "prospective relief" as defined by California Government Code section 12926, subdivision (a), including back pay, reimbursement of out of pocket expenses and any such other relief that this Court deems proper.

120.   As an actual and proximate result of Defendant's willful and intentional discrimination, Plaintiff has lost wages, benefits, and other out of pocket expenses.

121.   As an actual and proximate result of the aforementioned acts of Defendant, Plaintiff became mentally upset, stressed, aggravated, depressed, and suicidal. Plaintiff has experienced stress, migraines, anxiety, humiliation, embarrassment, sleeplessness, fear and emotional distress. Plaintiff claims general damages for mental distress in an amount according to proof at time of trial.

122.   The above described actions were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights. Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendant's future conduct.

///

///

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**          Lawrance A. Bohm, Esq.
*Zhang v. Parfet*                                                                  Andrew C. Kim, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**THIRD CAUSE OF ACTION**

**(Retaliation; Cal. Gov't Code § 12940(h))**

123.    The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

124.    At all times relevant to this action, it was unlawful under California Government Code section 12940, subdivision (h) and Title 2 of the California Code of Regulations section 11021 for employers to retaliate against Plaintiff for complaining about illegal practices. Defendant violated California Government Code section 12940, subdivision (h) and Title 2 of the California Code of Regulations section 11021 by retaliating against Plaintiff for communicating to Defendant that his sexual advances were unwelcome by, among other things, terminating her, denying her opportunity to apply to a different position, denying her leave, denying her a reasonable accommodation, and cancelling her benefits.

125.    Plaintiff's rejection of Defendant's unwelcome sexual advances were a substantial motivating reason for Plaintiff's termination, denial of the opportunity to apply to a different position, denial of leave, denial of a reasonable accommodation, and cancelled benefits.

126.    Defendant's conduct was a substantial factor in causing Plaintiff's harm.

127.    As an actual and proximate result of Defendant's willful and intentional discrimination, Plaintiff has lost wages, benefits, and other out of pocket expenses.

128.    As an actual and proximate result of the aforementioned acts of Defendant, Plaintiff became mentally upset, stressed, aggravated, depressed, and suicidal. Plaintiff has experienced stress, migraines, anxiety, humiliation, embarrassment, sleeplessness, fear and emotional distress. Plaintiff claims general damages for mental distress in an amount according to proof at time of trial.

129.    The above described actions were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights. Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendant's future conduct.

///

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**                    Lawrance A. Bohm, Esq.
*Zhang v. Parfet*                                                                              Andrew C. Kim, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

**FOURTH CAUSE OF ACTION**

**(Failure to Prevent Harassment, Discrimination, and Retaliation;**

**Cal. Gov't Code § 12940(k))**

130.    The allegations set forth in paragraphs above are hereby re-alleged and incorporated by reference.

131.    Defendant had a duty to prevent unlawful harassment and discrimination, including retaliation. Defendant knew or should have known about the harassment and discrimination based on sex and/or gender as set forth above. Defendant failed to implement adequate training, policies, or instructions that would have prevented the aforementioned harassment, discrimination and retaliation of Plaintiff. Defendant breached their duty to prevent the harassment, discrimination and retaliation of Plaintiff.  Accordingly, Defendant violated California Government Code section 12940, subdivision (k), Title 2 of the California Code of Regulations section 11019, subdivision (b)(3), and 29 Code of Federal Regulations section 1604.11, subdivision (f).

132.    Defendant failed to take all reasonable steps to prevent the harassment, discrimination and retaliation.

133.    Defendant's failure to take all reasonable steps to prevent harassment, discrimination and retaliation was a substantial factor in causing Plaintiff's harm.

134.    As an actual and proximate result of the aforementioned violations, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court. Plaintiff also seeks "affirmative relief" or "prospective relief" as defined by California Government Code section 12926, subdivision (a), including back pay, reimbursement of out of pocket expenses and any such other relief that this Court deems proper.

135.    As an actual and proximate result of Defendant's willful and intentional discrimination, Plaintiff has lost wages, benefits, and other out of pocket expenses.

136.    As an actual and proximate result of the aforementioned acts of Defendant, Plaintiff became mentally upset, stressed, aggravated, depressed, and suicidal. Plaintiff has experienced stress, migraines, anxiety, humiliation, embarrassment, sleeplessness, fear and

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

1   emotional distress. Plaintiff claims general damages for mental distress in an amount according

2   to proof at time of trial.

3       137.    The above described actions were done with malice, fraud, oppression and in

4   reckless disregard of Plaintiff's rights. Further, said actions were despicable in character and

5   warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendant's

6   future conduct.

7                           **FIFTH CAUSE OF ACTION**

8                  **(Wrongful Termination in Violation of Public Policy)**

9       138.    Plaintiff incorporates the allegations contained in the above paragraphs as though

10  fully set forth herein.

11      139.    Plaintiff was subjected to working conditions that violated public policy. After

12  Plaintiff communicated to Defendant that his sexual advances were unwelcome, Defendant

13  retaliated by subjecting her to working conditions that violated public policy. Defendant

14  terminated Plaintiff, denied her opportunity to apply to a different position, denied her leave,

15  denied reasonable accommodations, and cancelled her benefits.

16      140.    Defendant's conduct violated important public policy including but not limited to

17  the laws codified in California Government Code section 12940, subdivisions (a), (h), (j), and (k),

18  Title 2 of the California Code of Regulations sections 11019, 11020 and 11021, and 29 Code of

19  Federal Regulations section 1604.11, subdivision (f).

20      141.    Defendant intentionally created and/or knowingly permitted working conditions

21  that were so intolerable that a reasonable person in Plaintiff's position would have considered

22  Defendant's conduct and the work environment to be hostile and abusive. The harassment was

23  severe and/or pervasive.

24      142.    Plaintiff considered Defendant's conduct and work environment to be hostile or

25  abusive.

26      143.     The intolerable working conditions that Plaintiff endured were a substantial factor

27  in causing Plaintiff's harm.

28  ///

144.     As an actual and proximate result of the aforementioned violations, Plaintiff has been damaged in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

145.     As an actual and proximate result of Defendant's willful and intentional discrimination, Plaintiff has lost wages, benefits, and other out of pocket expenses.

146.     As an actual and proximate result of the aforementioned acts of Defendant, Plaintiff became mentally upset, stressed, aggravated, depressed, and suicidal. Plaintiff has experienced stress, migraines, anxiety, humiliation, embarrassment, sleeplessness, fear and emotional distress. Plaintiff claims general damages for mental distress in an amount according to proof at time of trial.

147.     The above described actions were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights. Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendant's future conduct.

///

///

///

///

///

///

///

**Plaintiff's Verified Complaint for Damages and Demand for Jury Trial**
*Zhang v. Parfet*

Lawrance A. Bohm, Esq.
Andrew C. Kim, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant and any other Defendants who may be later added to this action as follows:

1.  For compensatory damages, including, but not limited to lost wages and emotional distress in an amount according to proof;

2.  For attorneys' fees and costs pursuant to all applicable statutes or legal principles;

3.  For costs of suit incurred;

4.  For punitive damages pursuant to all applicable statutes or legal principles;

5.  For prejudgment interest on all amounts claimed pursuant to California Civil Code section(s) 3287 and/or 3288;

6.  For injunctive relief preventing further discrimination and retaliation and as otherwise deemed appropriate;

7.  For such other and further relief as the court may deem proper.

Respectfully Submitted,

Dated: August 1, 2016                    By: /s/ Andrew C. Kim
                                              LAWRANCE A. BOHM, ESQ.
                                              ANDREW C. KIM, ESQ.

                                              Attorneys for Plaintiff
                                              SHUANG ZHANG

## **DEMAND FOR JURY TRIAL**

Plaintiff SHUANG ZHANG hereby demands trial by jury for this matter.

Dated: August 1, 2016                    By: /s/ Andrew C. Kim
                                              LAWRANCE A. BOHM, ESQ.
                                              ANDREW C. KIM, ESQ.

                                              Attorneys for Plaintiff
                                              SHUANG ZHANG

Plaintiff's Verified Complaint for Damages and Demand for Jury Trial

*Zhang v. Parfet*

Lawrance A. Bohm, Esq.
Andrew C. Kim, Esq.

BOHM LAW GROUP, INC.
4600 NORTHGATE BOULEVARD, SUITE 210
SACRAMENTO, CALIFORNIA 95834

1

## VERIFICATION OF COMPLAINT FOR DAMAGES

2

3    I, SHUANG ZHANG, have read the attached Complaint for Damages and hereby attest

4  that the same is true of my own knowledge, except as to those matters, which are therein stated

5  on my information or belief, and as to those matter that I believe it to be true.

6    I declare under penalty of perjury under to the laws of the State of California that the

7  foregoing is true and correct.

8    This Verification was executed on *August 1, 2016* , in Sacramento, California.

9

10

11    _____

          SHUANG ZHANG

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

VERIFICATION OF COMPLAINT FOR DAMAGES